**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CAROLYN S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  19 C 385** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Carolyn S. ("Claimant")[1] brings a motion for summary judgment to reverse the

final decision of the Commissioner of Social Security ("Commissioner") that denied her

application for a period of disability and Supplemental Security Income ("SSI") under the Social

Security Act.  42 U.S.C. §§ 416(i), 402(e), and 423.  The Commissioner has brought a cross-

motion for summary judgment seeking to uphold the Social Security Agency's ("SSA") decision

finding that Claimant is not disabled.  The parties have consented to the jurisdiction of the

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This Court has jurisdiction to

hear this matter pursuant to 42 U.S.C. §§ 405(g) and 138(c)(3).  For the reasons stated below,

Claimant's motion for summary judgment [13] is granted and the Commissioner's cross-motion

for summary judgment [18] is denied.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social
Security applicant in an opinion.  Therefore, only the claimant's first name shall be listed in the caption.
Thereafter, we shall refer to Carolyn S. as Claimant.

## I. BACKGROUND

### A. Procedural History

On August 20, 2015, Claimant filed a disability application alleging a disability onset date of April 14, 2015. Her claim was denied initially and upon reconsideration. On January 2, 2018, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. The Appeals Council denied review on November 17, 2018, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. § 404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in District Court on January 18, 2019.

### B. Medical Evidence[2]

#### 1. Evidence from Claimant's Treatment History

Claimant began treatment for bipolar disorder with psychiatrist Dr. Erich DeCastro in 1999. (R. 575). The earliest record entry, however, is an October 7, 2011 treatment note from psychotherapist Dr. Stephan Romm who treated Claimant at Dr. DeCastro's request. Dr. Romm noted that Claimant was "more or less stable" on medications that included Zoloft, Lamictal, and Seroquel but that she could be easily overwhelmed "when there are a lot of distractions in the work environment." (R. 476). Dr. Romm's treatment notes reflect multiple examples of these behaviors. He noted in December 2011 that Claimant easily became angry with others and could be "socially rude" when she did not get her way. (R. 475). He described her as "very impulsive" and "super sensitive to rejection." (R. 474).

---

[2] Claimant suffers from degenerative disc disease of the lumbar spine, obesity, and bipolar disorder. (R. 19). Because the Court's remand is based on the Claimant's bipolar disorder, the Court does not address the evidence related to her physical impairments.

These behaviors had not improved by December 2012 when Dr. Romm noted that Claimant "quickly takes offense, speaks in a harsh manner . . . and offends people without realizing it." (R. 472). Dr. Romm's treatment notes up to the alleged onset date of April 14, 2015 continue to document incidents of acting out, impulsivity, and rapid conversational behavior even though Claimant added lithium to her medications for bipolar disorder. (R. 458, "She wants to work on her problem with impulsively changing topics and jumping around in her conversations. A coworker complained that he couldn't follow her conversation"). Dr. Romm's few notes after the onset date show that Claimant continued to experience difficulties from her bipolar disorder. On October 16, 2015, he remarked that her capacity for functioning around others was "severely limited." (R. 442).

Dr. Romm issued a medical opinion for Claimant on October 23, 2015. He noted that Claimant had suffered from bipolar disorder since childhood. Her symptoms included hypomania, depression, and serious impulsiveness that causes her to encounter interpersonal difficulties with co-workers. Dr. Romm stated that Claimant's response to psychotherapy was "poor" and that she "verbally lashes out" at others despite the medications she takes. He noted that she was "easily emotionally insulted" and that her "very impulsive" reaction to perceived slights had caused "yelling" at co-workers, "storming off," and "pulling papers from other peoples' hands" at work. (R. 435-38).

Claimant was also evaluated by Dr. Randy Kettering at the SSA's request on October 19, 2015. He noted that Claimant was first psychiatrically evaluated at age 13 at the Menninger Hospital and that she was also treated by psychiatrists during high school. Dr. Kettering found that Claimant's mood was variable but that she had no delusional ideas, illogical thoughts, or a "looseness of associations." Dr. Kettering described her speech as "evenly paced." When asked

to name five large cities she named states instead. Claimant also refused to calculate serial sevens and could not perform double-digit additions or subtractions. Claimant's memory permitted her to recall seven numbers forward and four backwards; however, she could not remember any of three random numbers after a five-minute delay. Contrary to every other psychological expert who examined or treated Claimant, Dr. Kettering's diagnosis did not assess any mental disorder. Instead, he stated "R/O [rule out] Bipolar disorder, recurrent" and "R/O [rule out] Personality Disorder." (R. 430-33).

The record does not contain treatment notes from treating psychiatrist Dr. DeCastro. However, he issued a bipolar residual functional capacity ("RFC") report on March 8, 2016. Dr. DeCastro had treated Claimant since July 1999 for bipolar II disorder by providing medication management once every one to two months.[3] Dr. DeCastro noted that Claimant's mental impairment affected her concentration in several ways. Stress triggered irritability and decreased her focus – both of which led Claimant to make inappropriate statements. Claimant also suffers from mood swings that make her more irritable and impatient with her supervisors. That said, Dr. DeCastro did not believe that Claimant would need to be off-task more than 15 percent during a normal work day though she would need to be absent from work one day each month. Dr. DeCastro concluded that Claimant suffered from a moderate restriction in her activities of daily living and marked restrictions in her social functioning and ability to maintain concentration, persistence, or pace. (R. 576-77).

In May 2017, Claimant began treatment for her mental disorder at Counseling Speaks, LLC with Dr. Matt Glowiak after Dr. Romm retired. It was noted on several visits that she

---

[3] Bipolar II disorder is similar to the more common bipolar I disorder. "However, in bipolar II disorder, the 'up' moods never reach full-blown mania. The less-intense elevated moods in bipolar II disorder are call hypomanic episodes, or hypomania." https://www.webmd.com/bipolar-disorder/guide/bipolar-2-disorder#1 (last visited Dec. 27, 2019).

"appeared agitated with some tangential speech." (R. 672-75). A July 12, 2017 treatment note states that she was struggling to focus and "becomes overwhelmed and teary when describing social interactions." (R. 677). Dr. Glowiak issued a report on August 24, 2017 diagnosing Claimant with bipolar I disorder. He noted that she displayed a "tangential" flight of ideas, was easily distracted, and had limited insight. (R. 670, "Thought content . . . was positive for preoccupations and obsessive thoughts"). Dr. Glowiak concluded that Claimant had a limited ability to function independently and appropriately in a normal employment setting and "likely cannot perform at a consistent, competitive pace in a work setting." (R. 668-670).

### 2.      Evidence From the State-Agency Experts

On November 13, 2015, state-agency psychologist Dr. Ellen Rozenfeld issued her report concerning Claimant. She found that Claimant suffered from an affective disorder that imposed mild restrictions on her daily activities and created moderate restrictions in both her social functioning and in Claimant's ability to maintain concentration. Dr. Rozenfeld concluded that Claimant could have occasional contact with co-workers and supervisors and could tolerate occasional work changes even though her ability to handle stress was reduced. (R. 105).

### 3.      Evidence From Claimant's Testimony

Claimant appeared at the September 15, 2017 hearing and described her symptoms to the ALJ. Claimant stated that her bipolar symptoms fluctuate and that her condition goes "up and down." (R. 53). She also has difficulty with focusing and has been unable to pass her "cashiering quizzes" at the grocery stores she formerly worked at. (R. 54; R. 60, "I have no skills with numbers and calculating"). Medication moderates her symptoms but Claimant continues to be impulsive in her speech. In fact, she was fired from her former part-time job as a cashier after her "not filtered mouth" caused her to speak inappropriately to customers. At the

time of the hearing Claimant had again been working as a part-time cashier for three months and had already been reprimanded several times for inappropriate speech. Claimant had also permitted two customers to leave the store without noting that their credit cards had been declined. (R. 47).

Claimant described several incidents related to her impulsive speech. She became so upset during a phone call with her counselor that the paramedics were called when she threatened to slit her throat. (R. 53). At an earlier job as an x-ray technician, she had "many, many, many write ups" and was suspended after she was "too harsh" with a patient. (R. 61). She was written up at her former cashier job after reprimanding a customer for the amount of celery she bought. (R. 62, "I said how can you buy a stick and I kept saying it to her. I said you're not supposed to do that. That's not the right thing to do."). Claimant also spends money impulsively. (R. 56).

### C.     The ALJ's Decision

The ALJ issued a decision on January 2, 2018 finding that Claimant was not disabled. Applying the five-step sequential analysis that governs disability determinations, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since her alleged onset date of April 14, 2015. (R. 19). Her severe impairments at Step 2 included degenerative disc disease of the lumbar spine, obesity, and bipolar disorder. (R. 19). Claimant also had the non-severe impairments of hypothyroidism, a breast abscess, and acid reflux. (R. 20). None of these disorders met or medically equaled a listed impairment at Step 3 either singly or in combination. (R. 20). As part of the Step 3 analysis, the ALJ applied the "special technique" for evaluating the severity of mental disorders set out in 42 U.S.C. § 1520a. The ALJ found that Claimant had a mild limitation in understanding, remembering, or applying information as well as in her ability

to manage herself. Moderate restrictions were present in her ability to interact with others and in concentrating, persisting, or maintaining pace. (R. 21-22).

Before moving to Step 4, the ALJ evaluated Claimant's testimony on the frequency and severity of her symptoms by finding the record was not consistent with what Claimant described. The ALJ supported that conclusion by assigning weights to the expert reports she received. She assigned "partial" weight to the assessments of Dr. Romm, Dr. Glowiak, and Dr. Rozenfeld. Little weight was given to Dr. DeCastro's report, and the ALJ failed to weigh Dr. Kettering's even though he cited it. (R. 25-27). The ALJ then assessed Claimant's RFC by finding that she could carry out sedentary work as that exertional capacity is defined in 20 C.F.R. § 404.1567(a) from her alleged onset date through February 22, 2016. The ALJ also included the following non-exertional restrictions: "She can understand, remember and carryout simple routine tasks; use judgment related to simple work related decisions; have occasional interaction with supervisors and coworkers; and brief and superficial interaction with the general public." (R. 22).[4]

Based on these findings, the ALJ concluded at Step 4 that Claimant would not be able to perform any of her past relevant work. (R. 31). The vocational expert ("VE") testified that jobs were available in the national economy for someone with Claimant's RFC. The ALJ relied on the VE's testimony to determine at Step 5 that Claimant was not disabled.

_____

[4] The ALJ concluded at a later point in her decision that Claimant's physical condition improved to the point that as of February 23, 2016 through January 2, 2018 she could perform the more onerous demands of light work. (R. 29). *See* 20 C.F.R. § 404.1567(b) (defining light work). The ALJ included the same non-exertional restrictions in both the RFCs, however, and did not address Claimant's bipolar disorder as part of the second RFC assessment.

## II.    LEGAL ANALYSIS

## A.    The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims.  20 C.F.R. § 404.1520.  The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability.  20 C.F.R. § 404.1520(a)(4)(i).  It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above.  20 C.F.R. § 404.1520(a)(4)(ii).  At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings").  The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes.  If the listing is not met, the analysis proceeds to step four.  20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work.  The SSA then determines at step four whether the claimant is able to engage in any of his past

relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can do so, he is not disabled.  *Id*.

If the claimant cannot undertake her past work, the SSA proceeds to step five to determine

whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age,

education, and work experience.  An individual is not disabled if he or she can do work that is

available under this standard.  20 C.F.R. § 404.1520(a)(4)(v).

### B.    Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final

decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. §

405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial

evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting*

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983).  A court reviews the entire record,

but it does not displace the ALJ's judgment by reweighing the facts or by making independent

symptom evaluations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court

looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her

conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to

allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a

claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will

affirm a decision if the ALJ's opinion is adequately explained and supported by substantial

evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## III.  DISCUSSION

Claimant argues that the ALJ erred by (1) failing to properly weigh the reports of Dr. Romm, Dr. Glowiak, and Dr. DeCastro and (2) did not account in the RFC for all of the limitations that stemmed from her bipolar disorder.  Because the Court agrees that the ALJ failed to properly explain the weights given to Claimant's treating sources and finds that a remand for further proceedings is appropriate on this ground, it will only briefly address the RFC issue.

### A.  The ALJ Erroneously Assessed Dr. Romm's Opinion

An ALJ must assign specific weights to the reports of medical experts.  *See David v. Barnhart*, 446 F.Supp.2d 860, 871 (N.D.Ill. 2006) ("The weight given to a treating physician cannot be implied[.]").   When a medical opinion is not assigned controlling weight "the ALJ must explain the weight given to the consulting physician's opinion." *Turner v. Berryhill*, 244 F.Supp.3d 852, 859 (S.D.Ind. 2017) (citing 20 C.F.R. § 404.1527(e)(2)).  An ALJ does so by considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the ALJ's attention.  20 C.F.R. § 404.1527(c)(2)-(6); *see also Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009). [5]

Psychologist Dr. Romm issued his expert report on October 23, 2015.  The report included a series of findings concerning Claimant's recall, numerical calculations, and abstract thinking.  Dr. Romm also checked a box indicating that Claimant did not have a serious

---

[5] New regulations removed the treating physician rule in 2017, but only for claims filed after March 27, 2017.  20 C.F.R. § 404.1527c.  For claims like plaintiff's that were filed before that date, the factors set out in 20 C.F.R. § 404.1527 continue to apply.

limitation in performing tasks "on an autonomous basis without direct step-by-step supervision and direction."  (R. 437).  Nevertheless, Dr. Romm found that Claimant was easily distracted and had serious restrictions in understanding, remembering instructions, and in responding appropriately to supervisors and co-workers.

The ALJ credited the report to some degree because Dr. Romm was a specialist in treating mental health disorders.  *See* 20 C.F.R. § 404.1527(c)(5) (addressing specialization).  The ALJ failed to note, however, that Dr. Romm had been treating Claimant's bipolar disorder for four years and was more familiar with her mental impairment than any other medical source except for treating psychiatrist Dr. DeCastro.  The regulations state that "the longer a treating source has treated you . . . the more weight we will give to the source's medical opinion."  20 C.F.R. § 404.1527(c)(2)(i); *see also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).  Although an ALJ does not always have to address each of the six regulatory factors on an item-by-item basis, the extended duration of Dr. Romm's treatment history should have alerted the ALJ that she needed to consider this factor as part of her evaluation.  Indeed, "[g]iven that there were two physicians, that they were both specialists in psychiatric disorders, and that they examined the plaintiff over a period of years, the checklist *required* the administrative law judge to give great weight to their evidence unless it was seriously flawed."  *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (emphasis added) (citing cases).

Instead of great weight, the ALJ gave only partial weight to Dr. Romm by citing three flaws that she found in his report.  The first involved the timing of Dr. Romm's treatment of Claimant.  Most of Dr. Romm's treatment notes pre-dated Claimant's alleged onset date of April 14, 2015.  The ALJ did not consider any of those notes and used the fact that they pre-dated the onset date to devalue the importance of Dr. Romm's report.  The ALJ did not explain the basis of

her reasoning but she presumably found the pre-onset notes to be irrelevant. The Commissioner defends the ALJ's decision on ground that the pre-onset notes *are* relevant because Claimant worked part-time as an x-ray technician during her treatment with Dr. Romm from 2011 through 2015. The Commissioner points out – correctly – that the symptoms that Dr. Romm noted in his pre-onset notes are largely the same as those that Claimant alleged after April 14, 2015. The Commissioner contends that the fact that Claimant could work before her alleged onset date means that she can work after that date despite her bipolar disorder.

This argument fails on two grounds. First, the ALJ did not cite Claimant's work history as a reason for discounting Dr. Romm's report. That prevents the Commissioner from raising the issue at this point because the Commissioner cannot defend an ALJ's decision on grounds that the ALJ did not cite. *See, e.g.*, *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he Chenery doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). Second, the Commissioner erroneously presumes that Claimant's ability to work part time means that she could work full time. It is well established, however, that "[t]he fact that [a claimant] pushed herself to work part-time and maintain some minimal level of financial stability, despite her [impairment], does not preclude her from establishing that she was disabled." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013); *Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 918 (7th Cir. 2003). That is especially true in this case where Claimant had been fired from her part-time job as a cashier in June 2017 after customers complained about behavior that all experts agreed was caused by her bipolar disorder. (R. 46). The Commissioner fails to even address -- let alone, to persuasively explain - - how

Claimant would be able to work full time when she had such difficulty sustaining work on a part-time basis.

The ALJ also criticized Dr. Romm's report based on the frequency of his treatment sessions with Claimant. *See* 20 C.F.R. § 404.1527(c)(2)(i) (addressing the frequency of treatment). The ALJ did not find fault with the number of times that Claimant saw Dr. Romm; instead, she complained that Claimant had discontinued her relationship with him. Although the ALJ did not specify any dates, the Court's review of the record shows an eight-month gap in Claimant's treatment with Dr. Romm from January 28, 2015 through September 15, 2015. (R. 443-44). The ALJ claimed that Claimant "only reestablished treatment with Dr. Romm after spinal surgery" in August 2015. (R. 25). That implied that she was less restricted than she or Dr. Romm stated because Claimant only restarted treatment after she alleged that she was disabled.

The Court disagrees with this reasoning. The ALJ did not explain why Claimant's interrupted treatment implied that her bipolar symptoms were less restrictive than Dr. Romm's report reflected. Certainly, there was nothing unique about gaps in Claimant's treatment record; the pre-onset notes show multiple interruptions including another eight-month hiatus from December 23, 2011 to August 31, 2012. (R. 473-74). Before construing this sporadic treatment history against Claimant, the ALJ was required to consider whether her mental impairment prevented Claimant from seeing Dr. Romm more consistently. "The Seventh Circuit has emphasized that 'mental illness in general and bipolar disorder in particular . . . may prevent the sufferer from . . . submitting to treatment." *Barnes v. Colvin*, 80 F.Supp.3d 881, 886 (N.D.Ill. 2015), *quoting Kangail v. Barnhart*, 454 F.3d 627 630 (7th Cir. 2006) (citing cases); *see also White v. Comm. of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the

very failure to seek treatment is simply another symptom of the disorder itself."); *Lewis v. Colvin*, No. 14 C 50195, 2016 WL 4530338, at *4 (N.D.Ill. Aug. 30, 2016). The ALJ never considered this issue and failed to ask Claimant anything about her treatment history at the administrative hearing.

The ALJ further criticized Dr. Romm's report because the psychologist noted that Claimant had mild anxiety and depression, was non-delusional, and was oriented to person, place, and time. The Court fails to see how any of these statements contradict Dr. Romm's mental assessment. The fact that Claimant was well-oriented and non-delusional only means that she was not openly psychotic – a claim that neither she nor any of her treaters ever made – and could carry out activities like household duties and taking public transportation (R. 437). By contrast, Dr. Romm's restrictions were based on *how* Claimant went about doing those things in the workplace. He stated that she "verbally lashes out at others," is "very impulsive," and "reacts with verbal aggression." (R. 437-38). Neither Dr. Romm nor any other expert linked these behaviors to the severity of Claimant's anxiety or depression; instead, Dr. Romm said that they were a result of Claimant's sense of being "slighted." (R. 437). Without a medical expert to clarify the issue for her, therefore, the ALJ had no ground for citing mild anxiety and depression as reasons for discounting Dr. Romm's conclusions. Remand is required so that the ALJ can reconsider the full record on this topic and articulate the basis of her reasoning with greater care.

**B.   The ALJ Erroneously Assessed Dr. DeCastro's Opinion**

As noted earlier, *supra* at Section I(B)(1), treating psychiatrist Dr. DeCastro issued a report on March 8, 2016 finding that Claimant's lack of attention and mood swings would make it difficult for her to follow through on tasks; that she had moderate restrictions in her concentration and social functioning; and that she would be absent from work one day each

14

month.  The ALJ assigned the report "little" weight – the least weight given to any assessment of Claimant's bipolar symptoms – on the grounds that (1) Dr. DeCastro did not conduct a mental status exam, (2) his findings contradicted a January 2017 exam, (3) and Dr. DeCastro's findings were inconsistent with Dr. Romm's mental status exam.

These reasons fail to explain why the ALJ dismissed Dr. DeCastro's report.  The regulations require an ALJ to consider the nature and length of the treatment relationship between a physician and the claimant.  20 C.F.R. § 404.1527(c)(1)-(2).  Dr. DeCastro's report states that he had treated Claimant for bipolar disorder every one or two months since July 1999.  That amounts to more than 100 treatment sessions over 17 years by the time of the ALJ's January 2, 2018 decision, making Dr. DeCastro the expert with the greatest familiarity with Claimant's mental functioning.  As with Dr. Romm, however, the ALJ did not consider that fact or even indicate that she was aware of it.

Instead of addressing this factor, the ALJ faulted Dr. DeCastro for not carrying out a "mental status exam."  The Court is unable to follow the basis of the ALJ's reasoning on this issue because she placed an inconsistent emphasis on it throughout her decision.  The ALJ gave less weight, for example, to Dr. DeCastro than she did to the state-agency psychologist Dr. Rozenfeld even though Dr. Rozenfeld did not examine Claimant.  By definition, therefore, Dr. Rozenfeld could not have performed a mental status exam.  The ALJ never explained why the absence of a formal exam could be held against a psychiatrist who treated Claimant for 17 years but did not apply to an expert who never met her.  Greater weight is ordinarily given to the opinion of a treating source than to a non-treating source like Dr. Rozenfeld, 20 C.F.R. §

404.1527(c), and an "ALJ should explain any deviations from this hierarchy." *Gloege v. Saul*, --F.Supp.3d --, 19-cv-250, 2019 WL 6001659, at *3 (W.D.Wis. Nov. 14, 2019).[6]

The ALJ confused matters further by criticizing Dr. DeCastro's report based on the "updated mental status examinations discussed below" in her decision. (R. 26). She identified the first of these alleged exams as a January 2017 record entry stating that Claimant "denied feeling down, depressed, or hopeless over the last month." (R. 26). The ALJ implied that this January 2017 entry was made by a psychological expert whose opinion trumped Dr. DeCastro's because it was based on a mental status exam. In reality, the entry was made on January 9, 2017 by Dr. Theresa Kuppy as part of a comprehensive *physical* exam that involved blood tests, cardiovascular findings, and respiratory notes. Nothing suggests that Dr. Kuppy – whom the ALJ did not identify – had any expertise in treating mental disorders or that she did anything other than ask Claimant as part of the general exam if she had been depressed.

The ALJ had no reasonable basis for relying on this brief entry to refute Dr. DeCastro's expert findings without first determining who Dr. Kuppy was and explaining why entering a brief statement as part of a much longer report involved a "mental status exam." If a non-specialist can be credited for conducting such an exam without any evidence of having done so, it is difficult to understand what it was about Dr. DeCastro's report that the ALJ found

---

[6] Since this case already requires remand, the ALJ should restate her reasons for the evaluation of Dr. Rozenfeld's report. The ALJ gave it "partial" weight – the same weight given to the reports of Dr. Romm and Dr. Glowiak – but she did not question any aspect of Dr. Rozenfeld's opinion and appears to have adopted everything that the expert stated about Claimant's mental functioning. That suggests that the ALJ gave more weight to Dr. Rozenfeld's opinion than she stated. The regulations provide that an ALJ should "always give good reasons" for the weight assigned to an expert's report. 20 C.F.R. § 404.1527(d)(2). Part of the ALJ's reasoning was that Dr. Rozenfeld's findings were consistent with the ALJ's RFC assessment. That was erroneous for the reasons discussed below, *infra* at Sec. III(3). The ALJ is reminded that "[t]he opinions of non-examining experts are subject to stricter assessment standards than those of treating physicians." *Dorion v. Colvin*, No. 13 C 4721, 2015 WL 2398405, at *2 (N.D.Ill. May 18, 2015).

objectionable. Like Dr. Kuppy, Dr. DeCastro also made statements about Claimant's psychological state in his report. (R. 575, describing the effects of "mood swings"). That was presumably based on at least as much inquiry into her mental condition as Dr. Kuppy's remark was. Moreover, Dr. DeCastro prescribed powerful psychotropic medications for Claimant's bipolar disorder such as Lithium, Buspar, and Seroquel. A psychiatrist who prescribes such medications over multiple years can be expected to have questioned Claimant about her emotions to the degree that Dr. Kuppy did during a physical exam. The ALJ overlooked all of the medications that Dr. DeCastro prescribed, however, and never asked Claimant anything about her treatment with him.

Even if that were not the case, the ALJ had no ground for discounting Dr. DeCastro's report because of Dr. Kuppy's January 2017 entry. The fact that Claimant was not depressed for one month or longer does not state anything meaningful about Dr. DeCastro's report or the seriousness of Claimant's bipolar symptoms. ALJs are strictly prohibited from making broad generalizations about the severity of bipolar disorder based on a claimant's condition during a limited period of time. "The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has a 'good day' does not imply that the condition has been treated." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *see also Kangail*, 454 F.3d at 629 (noting that "bipolar disorder is episodic"); *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (stating that "bipolar disorder . . . is by nature episodic and admits to regular fluctuations even under proper treatment"). To this point, Claimant told the ALJ that her symptoms went "up and down." (R. 53). The ALJ ignored that statement and did not express any awareness that bipolar symptoms should be expected to vary over time. As the Seventh Circuit has stated, the failure to address such fluctuations

"demonstrate[s] a fundamental, but regrettably all-too-common, misunderstanding of mental illness." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

In addition to Dr. Kuppy's mental status exam, the ALJ also cited Dr. Romm's report to give less weight to Dr. DeCastro's report. The ALJ did not address why Dr. Romm contradicted Dr. DeCastro, however, and the Court cannot follow her logic. As stated earlier, *supra* at Sec. III(A), the ALJ noted that Dr. Romm found that Claimant was only mildly anxious and was oriented to person, place, and time. That does not contradict Dr. DeCastro's report because Dr. DeCastro never stated that Claimant was delusional or that her inappropriate behaviors were a function of how anxious she was. Dr. Romm also found that Claimant had normal abstract thinking and could repeat four numbers forward but none backward – findings that evaluated Claimant's cognitive functioning. (R. 436-37). Again, however, Dr. DeCastro did not base his assessment on any inherent cognitive deficiency in Claimant. He explained instead that Claimant would "act or make inappropriate statements" when she was irritable and that "her *mood swings* would make her more irritable and she would be more impatient." (R. 575-76) (emphasis added). The ALJ did not cite that crucial part of Dr. DeCastro's findings or identify anything in Dr. Romm's report that cast doubt on it. Remand is therefore necessary so that the ALJ can explain the basis of her reasoning more carefully and build a logical bridge between the record and her assessment of Dr. DeCastro's report.

### C. The ALJ Erroneously Assessed Dr. Glowiak's Report

On August 24, 2017, treating psychologist Dr. Matt Glowiak examined Claimant and issued a report. Dr. Glowiak stated that Claimant's bipolar disorder caused her "to struggle with detailed instructions" and gave rise to inappropriate interactions in the workplace. She had a "limited" ability to sustain appropriate mental functioning at work and "likely cannot perform at

a consistent, competitive pace in a work setting." (R. 670). The ALJ gave "partial" weight to Dr. Glowiak's report on the ground that the case record was consistent with the ALJ's own RFC and did not support Dr. Glowiak's findings.

The ALJ's citation of her own RFC to evaluate Dr. Glowiak's report was erroneous. A medical source statement like Dr. Glowiak's report is relevant to assessing a claimant's RFC because the RFC should consider an expert's evaluation of the claimant's functioning. *See* SSR 96-8p, 1996 WL 374184, at *5 (stating that the RFC is based on "*all* of the relevant evidence in the case record" including "medical source statements") (emphasis in original). Contrary to the ALJ's assumption, however, an adjudicator "gets things backwards" when she reverses that hierarchy by invoking the RFC to evaluate an expert's report. *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012) (addressing the relation between the RFC and a credibility assessment). Assessing a doctor's report in light of the RFC "implies that the ALJ first determined the RFC, and then accepted or rejected the medical opinions based on whether those opinions fit the RFC, which is reversible error." *Mounts o/b/o Mounts v. Berryhill*, No. 3:17-CV-155, 2018 WL 3238555, at *4 (N.D.Ind. July 2, 2018); *see also Bjornson,* 671 F.3d at 645-46.

The ALJ also failed to draw any link between the treatment records she cited and her evaluation of Dr. Glowiak's report. She referred to a June 7, 2017 progress note stating that Claimant was well groomed, made eye contact, did not want to kill herself or others, and was looking for work. (R. 672). The ALJ cited these findings as if their relevance to the issue were self-evident. To the contrary, disability is not always incompatible with the desire to work because "[a] disabled person may want to work, may seek work, and in some cases may land work." *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015). A claimant can also be disabled without being suicidal or homicidal. Moreover, none of Claimant's treaters linked her

inappropriate social behavior to such extreme states of mind.  Courts have further rejected a claimant's demeanor and eye-contact in therapy sessions as reasons for questioning the claimant's alleged psychological restrictions.  *See Kangail*, 454 F.3d at 629 (rejecting an ALJ's finding that a claimant's allegation of mental illness was contradicted by "behaving pretty normally during her office visits"); *Voorhees v. Colvin*, 215 F.Supp.3d 358, 385 (M.D.Pa. 2015) (criticizing an ALJ's rejection of mental illness allegations because the claimant "was noted to appear cooperative, friendly, and making good eye-contact").  As for being well groomed, the Seventh Circuit has explained that rejecting a treating source opinion because a bipolar claimant dresses appropriately and can carry out basic daily activities "suggest[s] a lack of acquaintance with bipolar disorder." *Bauer*, 532 F.3d at 608; *see also Wagner v. Saul*, No. 17-cv-159, 2019 WL 3984025 at *6 (W.D.Wis. Aug. 23, 2019).

Finally, the ALJ reasoned that she did not need to give further consideration to Dr. Glowiak's findings about Claimant's interpersonal behaviors because "[t]he undersigned has acknowledged a limitation [in] interacting with others in the [RFC]."  (R. 26).  Even if the mental RFC properly accounted for Claimant's restrictions, this reasoning repeats the ALJ's earlier error of citing the RFC to evaluate a treating source opinion.  In reality, however, the ALJ did not explain the basis for the mental RFC because she failed to account for Claimant's testimony on the effects of her bipolar disorder.  The ALJ's sole consideration of Claimant's interpersonal problems consisted of citing Dr. Glowiak's notes for the proposition that "updated treatment records indicated that she lost a part-time job due to problems getting along with customers."  (R. 21).  That overlooked everything that Claimant stated at the hearing about the nature of her difficulties, their frequency, or their consistency over time.  The ALJ could not explain the reason for assigning partial weight to Dr. Glowiak's report without first considering what

Claimant actually stated about the behaviors that formed the basis of Dr. Glowiak's assessment. Remand is therefore required so that the ALJ can account for Claimant's testimony and build a logical bridge between the record and her finding.[7]

## IV.    CONCLUSION

For these reasons, Claimant's motion for summary judgment [13] is granted.  The Commissioner's motion for summary judgment [18] is denied.  The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.  On remand, the ALJ shall restate the reasons for the weights given to the reports of Dr. Romm, Dr. Rozenfeld, Dr. DeCastro, and Dr. Glowiak.  The ALJ shall also explain more carefully the reasons that support Claimant's mental RFC.

**Jeffrey Cummings**
**United States Magistrate Judge**

**Dated:  January 15, 2020**

---

[7] The ALJ should also explain more fully her reasoning for the mental RFC.  SSR 96-8p requires the RFC to include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts  . . . and nonmedical evidence[.]"  1996 WL 374184, at *7.  An ALJ cannot comply with that directive when she overlooks a claimant's testimony about her work attempts.  *See id.* at *5 ("The RFC assessment must be based on *all* of the relevant evidence in the record, such as . . . [e]vidence from attempts to work.") (emphasis in original).